Filed 4/29/15  P. v. Anthony CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B250277 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA315933) |
| v. | |
| JERRY DARNELL ANTHONY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed as modified.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Jerry Darnell Anthony, appeals his conviction for aggravated mayhem with firearm, prior serious felony conviction and prior prison term enhancements (Pen. Code, §§ 205, 12022.53, 667, subds. (a)-(i), 667.5).[1] He was sentenced to state prison for a term of life, plus 33 years to life.[2]

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Introduction.*

On June 13, 1999, following an argument with her neighbor and her neighbor's boyfriend, the victim – Treauna Turner – was shot by the boyfriend, defendant Anthony. Turner survived the shooting but was paralyzed from the waist down. After Anthony fled the scene, his girlfriend lied to the police about his identity. As a result, the police investigation into Turner's shooting reached a dead end and charges were not brought against Anthony until 2007. His first trial in 2008 ended in a hung jury, but a verdict was reached after retrial in 2011. The jury convicted Anthony of attempted murder, but found the offense had not been premeditated. Because the unpremeditated attempted murder conviction had to be dismissed on statute of limitations grounds, the trial court based Anthony's sentence on his accompanying conviction for aggravated mayhem. It is from this judgment that Anthony now appeals.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Anthony's prison term of life, plus 33 years to life consisted of the following: an indeterminate life term for the aggravated mayhem conviction (with the minimum parole eligibility term doubled under the Three Strikes law) (§§ 205, 667, subd. (e)(1)), plus a consecutive term of 25 years to life for the enhancement of personally discharging a firearm causing great bodily injury (§ 12022.53, subd. (d)), plus consecutive terms of five years for the prior serious felony conviction enhancement (§ 667, subd. (a)(1)) and one year each for three prior prison term enhancements (§ 667.5, subd. (b)).

2. *Prosecution evidence.*

In June 1999, Turner and her seven-year-old son were living on Estrella Avenue in Los Angeles. Barbara Ann Patterson and her two young sons lived down the street. Patterson was dating defendant Anthony at this time.

Patterson testified that on June 13, 1999, she hosted a barbeque that was attended by both Anthony and Keith Orange, the father of one of her sons. During the barbeque, Turner's and Patterson's sons started fighting. As a result, Turner argued first with Patterson and then with Anthony. When the argument ended, everyone went home. Later that day, Patterson went to Turner's apartment to talk about the fact their sons were always fighting. Anthony came with Patterson and he again argued with Turner. Patterson testified she decided to leave while Turner and Anthony were still arguing. As she was leaving Turner's apartment, Patterson heard gunshots. Although Patterson had seen a gun in Anthony's hand, she testified she did not see him fire it.

After the shooting, Patterson called her grandparents and told them Anthony had just shot the lady down the street. Patterson and her children moved away from Estrella Avenue that night and never returned; she moved in with Anthony's sister. Three or four days after the shooting, Patterson told her mother, Judy Betts, that Anthony had done the shooting.

Turner's son testified that on the day of the shooting he fought with Patterson's sons and then the two mothers started arguing. A man came out of Patterson's apartment building and joined the argument, but then everyone went home. Half an hour later, Turner's son was on the porch outside their apartment when Patterson arrived. She and Turner started arguing again. Twenty minutes later, the same man who had earlier been arguing with Turner arrived and joined the argument. Addie Bland, a friend of Turner's who had been visiting her, was also inside the apartment. When Turner's son heard a gunshot, he looked in through the doorway and saw the man holding something with a blue rag over it which he was pointing at Turner, who was lying on the floor. The man ran from Turner's apartment and, as he ran, he looked "like he was trying to put away

3

something." Turner's son identified Anthony in a photo array in 2007, but he did not identify Anthony in court.

Two other neighborhood children who had witnessed these events gave testimony. Angela was nine years old at the time of the shooting, and 21 years old when she testified in 2011. She had seen the boys fighting and Turner arguing with Patterson and Anthony. Angela believed Anthony was Patterson's boyfriend because of the way he was acting, but she had not seen him before that day. Anthony called Turner a bitch and looked like he was going to spit in her face. Later, Angela was playing outside when Anthony and Patterson knocked on Turner's door and went in. Angela heard Anthony and Turner arguing again, followed by gunshots. Anthony ran outside, followed by Patterson. Anthony was putting a small black handgun into his back pocket as he jogged down the street. Anthony then fled in Patterson's Dodge Neon. Angela went into the apartment and saw Turner on the floor, bleeding. Shown a photographic lineup shortly before the 2011 trial, Angela positively identified Anthony as Patterson's boyfriend and the man she had seen with the handgun.

Reginald was 12 years old at the time of the shooting, and 24 or 25 years of age when he testified in 2011. Patterson's boyfriend Anthony had been present when the boys were fighting. Anthony was upset because "he just didn't like how the fight turned out." After the fight was over, Reginald was outside Turner's house when he saw Anthony and Patterson go in. He heard Anthony trying to start another argument, followed by gunshots. When Anthony ran out of Turner's house, Reginald could see that he had a pistol in his hand. Anthony put the gun into his pants pocket and then drove off in Patterson's Dodge Neon.

Patterson's older son was nine years old at the time of the shooting. On the day of the shooting, Anthony came outside and argued with Turner while Patterson was trying to stop the boys from fighting. Patterson's younger son was seven or eight years old at the time of the shooting. His father was Keith Orange, whom he described as "tall, about [6'4"], kind of big, 250, 260 [pounds]." Orange died in 2009. When the family was

4

staying on Estrella Avenue in June 1999, Orange was not living with them. On the day of the shooting Anthony had been there, not Orange.

Brenda Beasley lived next door to Turner on Estrella Avenue. On the day of the shooting, Beasley saw Turner and Patterson arguing. A man got involved in the argument and threw a can of beer at Turner. Later, Beasley heard gunshots and saw a man and a woman get into a Dodge Neon and drive off. In 1999, Beasley identified a photograph of Keith Orange as the man who had argued with Turner. At the 2011 trial, she testified a photograph of Anthony looked like the man who had argued with Turner that day, but she was not sure.

3. *Defense evidence.*

    a. *Turner's testimony.*

Turner was 19 years old at the time of the shooting. By the time of Anthony's retrial in 2011, Turner herself had been convicted of murder and she was now serving a prison sentence.

On June 13, 1999, when Turner's son got into a fight with Patterson's sons, Turner approached Patterson to discuss the problem. They bickered and then a man Turner believed to be Patterson's boyfriend got involved. He and Turner argued; he threw a beer can at her and they spat at each other.

Addie Bland broke up their argument. Turner took her son home and Bland came over to calm her down. Later that day, Patterson came over to talk. Her boyfriend was standing behind Patterson and he also walked into Turner's apartment. They all went into the living room where Bland was sitting. The arguing continued. The man called Turner a bitch, pointed a gun at her head and fired. Turner dove onto the floor and the shot missed, shattering her television set. Turner testified the man then "put the gun to my back and shot me twice." Turner testified the bullets entered her back about six to eight inches below her right shoulder. As a result, she was permanently paralyzed from the waist down.

Turner testified she had never seen the gunman before that day. She also testified she was now confused about the gunman's identity and unsure if he was the same person who had argued with her. She did not remember testifying at Anthony's 2008 trial that she was certain the gunman was the same person she had argued with. In 2011, Turner testified she did not think she had ever seen Anthony before seeing him at the defense table.

b. *Detective Villalobos.*

On June 15, 1999, Detective Martina Villalobos learned Patterson's Dodge Neon had been recovered. The car's entire interior and exterior had been wiped down with baby oil or cooking oil and, as a result, it yielded no fingerprints.

Four days after the shooting, Patterson told Villalobos the gunman had been a man named Jeffrey Donald. Patterson described him as an African-American, about 6'0" or 6'1" tall, with medium skin tone, a mustache and full beard, and the word "Mom" tattooed on his right shoulder. Patterson said she had met him only a few days earlier and denied that he was her boyfriend. He had come over on the day of the shooting and gotten into an argument with some woman.

Villalobos was never able to locate Jeffrey Donald. However, based on Patterson's description, she came up with Keith Orange's name and confirmed he had a "Mom" tattoo on his right shoulder. Villalobos showed his picture to Brenda Beasley, who identified it as looking like the person who had argued with Turner on the day of the shooting. When Villalobos re-interviewed Turner in February 2000, Turner picked out Orange's photograph as someone who resembled the gunman.

c. *Charmaine Anthony.*

Anthony's sister, Charmaine, said she had been friends with Patterson for 11 years. In May or June 2011, Patterson told her that Anthony had shot Turner. But then Patterson began crying and said that actually she did not know who had done it. Charmaine testified Patterson told her that both Anthony and Keith Orange had been

6

present the day Turner was shot, but that even if Orange had done it Patterson would not testify against him "because he takes care of her kids."[3]

## CONTENTIONS

1. The trial court erred by not dismissing the entire prosecution for precharging delay.

2. The trial court erred by refusing to dismiss the aggravated mayhem charge for vindictive prosecution.

3. The trial court erred by admitting evidence Anthony was a gang member and had a gang-related tattoo.

4. There was insufficient evidence to support Anthony's conviction for aggravated mayhem.

5. The trial court improperly imposed a prior prison term enhancement.

## DISCUSSION

1. *Motion to dismiss for precharging delay was properly denied.*

Anthony contends the trial court erred by not dismissing the aggravated mayhem count of the information for precharging delay. This claim is meritless.

a. *Factual background.*

Turner was shot on June 13, 1999. An hour or two after the shooting, Patterson told the police a man named Jeffrey Donald had been the perpetrator. Detective Villalobos learned on June 15 that Patterson's Dodge Neon had been recovered, but that the car had been wiped clean and no fingerprints could be recovered. Although bullet casings had been recovered from the crime scene, no gun was ever found.

Four days after the shooting, Patterson told Villalobos the gunman had been Jeffrey Donald. Based on Patterson's physical description, which included the fact that Donald allegedly had "Mom" tattooed on his right shoulder, Villalobos identified Keith Orange as a possible suspect. On June 18, 1999, Brenda Beasley identified Orange in a photo array as the man who had argued with Turner and drove away in Patterson's car

---

[3] Oddly, Patterson purportedly said this even though Orange had died in 2009.

7

after the shooting. A month later, Addie Bland identified someone other than Orange from a photo array as the gunman. When Villalobos showed Turner the photo array, Turner did not identify Orange as the gunman. But on February 18, 2000, Villalobos showed Turner a different photo array and this time Turner identified Orange as the gunman.

On January 23, 2007, Detective Whalen spoke to Judy Betts, Patterson's mother, in connection with an unrelated investigation. At the time, Whalen knew nothing about Turner's shooting. Betts said Detective Whalen should look into a shooting that had happened on Estrella Avenue in 1999, and that he should talk to Patterson because Patterson's boyfriend Anthony had been involved. After talking to Betts, Whalen found a crime report describing the Turner shooting and documentation indicating the case had been closed after reaching an investigative dead end.[4]

Whalen then interviewed Patterson, who admitted having "lied to the police during her initial interview" and that she'd known all along Anthony was the person who shot Turner. Patterson said she gave police a fake name for the perpetrator. Whalen testified that when he took over the case in 2007, the investigation file showed an attempt had been made in 1999 to find Jeffrey Donald through DMV records.

b. *Procedural background*.

In September 2007, the People filed an information charging Anthony with attempting to murder Turner. Anthony filed a motion to dismiss the information, claiming his due process rights had been violated by the precharging delay. In June 2008, there was an evidentiary hearing on the dismissal motion at which the trial court took testimony.

Turner testified that about three years after the shooting, she was shown a family photograph album by a neighbor, Miss Walls. In the album there were pictures of her grandson whom Turner thought she recognized as the man who shot her. At one point,

---

[4] Whalen testified "[t]he two investigators had got to a point in the investigation where they didn't have any more information or any other leads in the case, and it was left basically on the shelf unsolved."

Turner visited the grandson and told him she forgave him for shooting her. Turner testified that, according to neighborhood rumor, the Walls family belonged to the 74 Hoover gang. Turner did not immediately go to the police with this information because she was afraid. About a year later she went to the police station intending to pass on the information. However, when she learned the investigation into her case had been closed, Turner got angry, made a scene and left the station without talking to anyone. While testifying at the June 2008 evidentiary hearing, Turner said both "I really don't know who shot me," and "[t]he picture Miss Walls showed me was the guy that shot me."

Following the hearing, the trial court denied Anthony's motion to dismiss for precharging delay because "the delay in this matter was not caused by any actions of the police department." When it subsequently denied Anthony's motion for reconsideration, the trial court said "the first and foremost reason for the delay in this matter" was the witnesses' failure "to cooperate fully with law enforcement," which did not change until Patterson's decision in 2007 "to deal forthrightly with the police about the incident."

        c. *Legal principles.*

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging. [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 430.) "A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. [Citation.] Prejudice to a defendant from precharging delay is not presumed. [Citations.] In addition, . . . 'under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. . . . If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the

9

delay.  [Citation.]  But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified.  [Citations.]" (*People v. Abel* (2012) 53 Cal.4th 891, 908-909, fn. omitted.)

*United States v. Lovasco* (1977) 431 U.S. 783 [97 S.Ct. 2044], one of the seminal precharging delay cases, explained:  "[I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused,' [citation], precisely because investigative delay is not so one-sided.  Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed,' [citation].  This the Due Process Clause does not require.  *We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time*."  (*Id.* at p. 795-796, fn. omitted, italics added.)

Our Supreme Court has said, "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case.  '[T]he necessity of allocating prosecutorial resources may cause delays valid under the *Lovasco* analysis.  [Citation.]  Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .'  [Citation.]  It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*People v. Nelson* (2008) 43 Cal.4th 1242, 1256-1257.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]."  (*People v. Cowan*, *supra*, 50 Cal.4th at p. 431.)

d. *Discussion*.

Anthony argues he was prejudiced by the eight-year precharging delay in this case because several potential witnesses died in the interim and others, including himself, suffered memory lapses. But Anthony has demonstrated nothing more than a slight possibility of prejudice that was easily overshadowed by the reason for that delay: an entirely legitimate investigative delay caused by the false information from Patterson, the key eyewitness to Turner's shooting.

Addie Bland, who was in the room when Turner was shot, died in 2001. Based on something Bland reportedly heard Patterson say,[5] Anthony argues Bland's death prevented him "from presenting evidence that would have independently corroborated Turner's 2000 identification of Keith [Orange] as the perpetrator." However, as the Attorney General points out, "[a] week after Turner was shot, Bland failed to identify Keith [Orange] in a photograph lineup, even though Bland told police officers just three days earlier that she would never forget the shooter's face." And not only did the evidence show that Orange was much too tall to have been the gunman, but also, there was very strong evidence Anthony was the person who shot Turner. Reginald and Angela were positive they had seen Anthony argue with Turner, go into her apartment with Patterson and then – after the shots were fired – flee while putting a handgun into his pants pocket. Even more damning, the three eyewitnesses who *knew* Anthony – that is, Patterson and her two sons – all testified he was the person who had been on Estrella Avenue that day arguing with Turner, and Patterson testified he was the person who had gone to Turner's apartment with her. In addition, near the time of the shooting Patterson told two different family members that Anthony had been the perpetrator.

---

[5]     Bland told police that when Patterson came to Turner's apartment prior to the shooting, she asked Turner, "Can my baby daddy come in?" Anthony suggests this comment meant it was Orange who went to Turner's apartment that day, not Anthony. A preliminary problem with this theory is that, at the evidentiary hearing on Anthony's dismissal motion, Turner testified Patterson "never stated nothing about baby daddy coming in, no."

11

Miss Walls also died before trial. But as the Attorney General argues, the jury was "fully informed of Turner's conversation with Miss Walls, Turner's identification of [her grandson] in the family photographs as the shooter, and Turner's encounter with [the grandson] in which she forgave him for shooting her." Although Turner was initially 100 percent certain Walls's grandson had been the gunman, by 2008 she was not so sure. Turner apparently had significant second thoughts about her identification of the grandson: at the evidentiary hearing, she testified she was *both certain and uncertain* whether Walls's grandson had been her assailant. More importantly, the grandson's culpability was wholly at odds with Anthony's main defense (which was that Keith Orange shot Turner), and this greatly reduced the evidentiary value of Turner's possible identification of the grandson.

Anthony complains the delay caused his own memories to fade and precluded him from recalling his whereabouts on the day of the shooting. But this self-serving and factually unsupported assertion, consisting solely of "trial counsel's declaration in support of the motion to dismiss [to the effect that] the delay also resulted in appellant's own fading memory of his whereabouts on the day of the shooting," is of little import. (See *People v. Cowan, supra*, 50 Cal.4th at p. 432 [defendant's " 'bare statement' of inability to recall 'realistically cannot be considered more than minimal prejudice' " as a result of precharging delay].)

Hence, the prejudice resulting from the precharging delay in this case was minimal at best. More importantly, this delay could not be attributed to the police because it had been entirely caused by Patterson lying about the perpetrator's identity. This led the criminal investigation into a dead end and it was not until January 2007 that the case was revived when Patterson's mother alerted Detective Whalen to Anthony's involvement. As a result, Patterson was re-interviewed, admitted her deceit, and identified Anthony as the gunman. New photo arrays were then shown to eyewitnesses who were able to identify Anthony as the perpetrator.

12

In *Nelson*, our Supreme Court found the defendant had demonstrated "some prejudice due to the delay" (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1250) – including unavailable witnesses, loss of memory and lost or destroyed physical evidence – but concluded: "In this case, the justification for the delay was strong. The delay was investigative delay, nothing else. The police may have had some basis to suspect defendant of the crime shortly after it was committed in 1976. But law enforcement agencies did not fully solve this case until 2002, when a comparison of defendant's DNA with the crime scene evidence resulted in a match . . . . Only at that point did the prosecution believe it had sufficient evidence to charge defendant. A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Id*. at p. 1256.) *Nelson* held, "In this case, balancing the prejudice defendant has demonstrated against the strong justification for the delay, we find no due process violation. We agree with the Court of Appeal's summary: '[T]he delay was not for the purpose of gaining an advantage over the defendant. [Citation.] Indeed, the record does not even establish prosecutorial negligence.' " (*Id*. at p. 1257.)

The case at bar is similar to *Nelson*: there was an extremely strong justification for the precharging delay that easily out-balanced whatever modest prejudice the delay caused Anthony. Therefore, we conclude the trial court did not abuse its discretion by refusing to dismiss this case for pre-charging delay. (See *People v. Cowan*, *supra*, 50 Cal.4th at p. 431.)[6]

---

[6] Anthony concedes that "no reported California cases have found due process violations where the delay is not attributable to the State," and he cites only one case from a foreign jurisdiction that did: *State v. Gray* (Tenn. 1996) 917 S.W.2d 668. But in that case a woman waited 42 years to accuse her uncle of child molestation. The Tennessee Supreme Court quickly limited the scope of *Gray*, holding in *State v. Utley* (Tenn. 1997) 956 S.W.2d 489, 495: "[G]iven the unique facts in *Gray*, we held that in analyzing a pre-accusatorial delay during which the state was unaware of the commission of the crime, the trial court must consider only the length of the delay, the reason for the delay, and the degree of prejudice to the accused. We indicated, however, that in other cases involving a pre-arrest delay, the due process inquiry continues to be guided by [*United States v. Marion* (1971) 404 U.S. 307, 324-325 [92 S.Ct. 455], a case requiring an intentional delay causing substantial prejudice]."

2. *Trial court properly refused to dismiss aggravated mayhem charge for prosecutorial vindictiveness*.

Anthony contends the trial court erred by refusing to dismiss the aggravated mayhem charge on the ground of vindictive prosecution. We disagree.

a. *Background*.

The original information, which was filed in September 2007, charged Anthony with premeditated attempted murder, but not with aggravated mayhem. In February 2008, Anthony asked the trial court to dismiss the attempted murder charge on the ground it violated the statute of limitations. In April 2008, the trial court denied this motion. In May 2008, before the trial started, the prosecutor filed an amended information adding a count that charged Anthony with aggravated mayhem.

At Anthony's first trial in 2008, a mistrial was declared after the jury deadlocked on both premeditated attempted murder and aggravated mayhem. In September 2009, Anthony asked the trial court to reconsider his motion to dismiss the attempted murder count under the statute of limitations. The reconsideration motion was denied.

Anthony petitioned this court in April 2010 to have the attempted murder charge dismissed, but in *Anthony v. Superior Court* (2010) 188 Cal.App.4th 700, we held that a prosecution for premeditated attempted murder may be commenced at any time under section 799.[7] At Anthony's second trial in 2011, he was convicted of both *unpremeditated* attempted murder and aggravated mayhem. He filed a post-trial motion seeking to have the aggravated mayhem count dismissed for vindictive prosecution. The trial court refused, concluding the prosecution had been within its discretion to amend the information during the pretrial period. The court did, however, dismiss the attempted murder conviction under the statute of limitations.

---

[7] Section 799 provides: "Prosecution for an offense punishable by . . . imprisonment in the state prison for life . . . may be commenced at any time."

14

b. *Legal principles.*

The constitutional protection against prosecutorial vindictiveness is based on the notion that it "would be patently unconstitutional" to "chill the assertion of constitutional rights by penalizing those who choose to exercise them." (*United States v. Jackson* (1968) 390 U.S. 570, 581 [88 S.Ct. 1209].) "[T]he presumption of unconstitutional vindictiveness is a legal presumption which arises when the prosecutor increases the criminal charge against a defendant under circumstances which . . . are deemed to present a 'reasonable likelihood of vindictiveness.' The presumption is not based on the subjective state of mind of the individual prosecutor and does not imply that he or she individually harbors an improper motive." (*In re Bower* (1985) 38 Cal.3d 865, 879.)

Vindictive prosecution can occur when a prosecutor increases the charges against a defendant who has exercised a constitutional procedural right, such as successfully appealing a conviction (see *North Carolina v. Pearce* (1969) 395 U.S. 711 [89 S.Ct. 2072]) or exercising a statutory right to a trial de novo after sustaining a misdemeanor conviction (see *Blackledge v. Perry* (1974) 417 U.S. 21 [94 S.Ct. 2098]). "Where the defendant shows that the prosecution has increased the charges *in apparent response to the defendant's exercise of a procedural right*, the defendant has made an initial showing of an appearance of vindictiveness. [Citation.]" (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 371, italics added.) "Given the severity of such a presumption however – which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct – the Court has [applied the presumption] only in cases in which a reasonable likelihood of vindictiveness exists." (*United States v. Goodwin* (1982) 457 U.S. 368, 373 [102 S.Ct. 2485].) Where there is no such reasonable likelihood, "the burden remains upon the defendant to prove actual vindictiveness." (*Alabama v. Smith* (1989) 490 U.S. 794, 799-800 [109 S.Ct. 2201].) Actual vindictiveness is " 'objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights.' " (*United States v. Ladeau* (6th Cir. 2013) 734 F.3d 561, 566.)

15

However, a presumption of vindictive prosecution does not arise where the People acted *before* the trial began.  As the United States Supreme Court has explained:  "There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. . . .  [¶]  . . . [A] defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor.  Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; *to plead an affirmative defense*; to request psychiatric services; to obtain access to government files; to be tried by jury.  It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter.  The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates."  (*United States v. Goodwin*, *supra*, 457 U.S. at p. 381, italics added.)

c.  *Discussion*.

Anthony contends the People retaliated against him for seeking to have the attempted murder charge dismissed on statute of limitations grounds by amending the information to charge aggravated mayhem, a crime which has no statute of limitations.  He asserts this "constituted vindictive prosecution, increasing his potential punishment and extending the limitations period for prosecution."

Anthony does not allege there was *actual* prosecutorial vindictiveness and, therefore, he must rely on the *presumption* of vindictiveness.  But given what occurred – charging a new offense in the pretrial period after Anthony drew attention to the fact there might be a statute of limitations problem with one of the original charges – a presumption of vindictive prosecution did not arise.  "California courts have followed the Supreme Court in refusing to apply a presumption of vindictiveness for prosecutorial action before commencement of trial.  [Citations.]"  (*People v. Bracey* (1994) 21 Cal.App.4th 1532, 1544.)

Contrary to Anthony's suggestion, the amendment did not expose him to a greater sentence because he was already facing a life term if convicted of premeditated attempted murder.  That he was ultimately only convicted of unpremeditated attempted murder, a

16

conviction which then had to be dismissed under the statute of limitations, does not change this fact. In any event, prosecutors have pretrial discretion to bring more serious charges when necessary in order to compensate for successful statute of limitations challenges. (See *Paradise v. Cci Warden* (2d Cir. 1998) 136 F.3d 331, 335-336 [no presumption of vindictiveness where state brought death penalty charge, after defendant won statute of limitations dismissal of lesser charge, because new charge was only offense that would not have been time-barred]; *United States v. Slatten* (D.D.C. 2014) 22 F.Supp.3d 9, 13-14 [no presumption of vindictiveness arising from pretrial reindictment for first degree murder after defendant successfully asserted statute of limitations defense to voluntary manslaughter "since that was the government's only option for keeping Slatten in the case at all"]; *State v. Gardner* (Mo. 1999) 8 S.W.3d 66, 70 [no presumption of vindictiveness when state upgraded complaint from involuntary manslaughter to second degree murder after defendant refused to waive statute of limitations defense to lesser crime].)

Here, once Anthony's conviction for attempted murder became questionable on statute of limitations grounds, the prosecution had discretion to make a pretrial amendment to the information in order to charge an offense that would not be time-barred. The trial court did not err by finding there was no vindictive prosecution.

3. *Gang evidence was properly admitted*.

Anthony contends the trial court erred by admitting evidence of his membership in a gang because there was no evidence Turner's shooting had been gang-related. This argument fails.

a. *Legal principles.*

Under Evidence Code section 352, a trial court has discretion to exclude evidence if its probative value is substantially outweighed by the probability of wasted time or the danger of undue prejudice, confusing the issue, or misleading the jury. (Evid. Code, § 352.) A trial court's exercise of this discretion will not be overturned on appeal absent a showing its discretion was abused. (*People v. Raley* (1992) 2 Cal.4th 870, 895; see also *People v. Von Villas* (1992) 10 Cal.App.4th 201, 268 [decision to admit or exclude

17

evidence lies within discretion of trial court and erroneous decisions are tested under *Watson*[8] harmless error standard].)

"In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation . . . can help prove identity . . . or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

b. *Discussion.*

Anthony complains about the following two items of gang-related evidence: (a) that the man who argued with Turner had gang tattoos; and, (b) that Patterson was afraid of Anthony because he was a gang member.

(1) *Testimony from Thyler.*

Anthony complains that Thyler R., who was six years old on the day of the shooting, was allowed to testify that the man who argued with Turner had "gang-related tattoos" on his arms. Asked why she characterized them as gang-related, Thyler explained: "Because . . . like all you saw, kind of like was stuff have [*sic*] to do with gangs. . . . I'm not sure what it said 'cus I don't want to be lying . . . . [¶] I think one of them said like 60 or something like that. I'm not sure. But they were gang related . . . ." Shown photographs of Anthony's arms, Thyler identified a tattoo reading "60" as a tattoo she had seen on the day of the shooting. Anthony argues this testimony should not have been admitted because the prosecutor failed to provide any foundation demonstrating Thyler was "qualified" to identify a gang-related tattoo when she was six years old: "The prosecution manifestly failed to establish that [Thyler] . . . was qualified to identify 'gang-related' tattoos. Her testimony should have been limited to her observation of a tattoo with the number '60' and the prosecution's evidence of appellant's tattoo should have been limited to the number on his arm."

---

8       *People v. Watson* (1956) 46 Cal.2d 818, 836.

The Attorney General argues Anthony failed to preserve the issue for appeal because he did not object on this ground at trial. Anthony asserts he did preserve the issue by objecting that Thyler had only been six at the time of the shooting. Whether or not Anthony's objection was sufficiently preserved, in the interests of judicial economy and to avert potential ineffective assistance of counsel claims, we will address the merits of this issue. (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310.)

Anthony has not cited any authority establishing that, just because Thyler was only six years old at the time of the shooting, she was now unqualified to report what she had seen. "As a general rule, 'every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter.' (Evid. Code, § 700; see Pen. Code, § 1321.) A person may be disqualified as a witness for one of two reasons: (1) the witness is incapable of expressing himself or herself so as to be understood, or (2) the witness is incapable of understanding the duty to tell the truth. (Evid. Code, § 701, subd. (a).) The party challenging the witness bears the burden of proving disqualification, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. [Citation.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 444.)

The cases Anthony has cited do not demonstrate Thyler was unqualified to testify about seeing a gang-related tattoo; they merely demonstrate that a layperson should not be allowed to render an expert opinion. *United States v. Augustin* (11th Cir. 2011) 661 F.3d 1105, concluded the trial court had properly precluded a witness from testifying about " 'gang terminology becoming part of a popular culture in Chicago communities,' " or that " 'young people who have marginal or no participation in street gangs are nevertheless affected by them,' " because this was "impermissible opinion testimony based on expertise." (*Id.* at p. 1127.) Similarly, *People v. Mejia* (2012) 211 Cal.App.4th 586, 615, explained that whether an assault had been personal or gang-related was a question for a gang expert, not the victim's own "lay person's opinion."

Thyler was simply testifying that the person who argued with Turner in 1999 had "gang tattoos" and this was how she identified the photograph of Anthony's arm tattoo. Anthony has failed to demonstrate that Thyler, who – when she testified – was capable of

19

expressing herself and understood her obligation to tell the truth, was somehow unqualified to testify about what she had seen when she was six years old *just because she was six*. The trial court did not abuse its discretion by admitting Thyler's testimony.

(2) *Statements by Patterson.*

Anthony contends the trial court should not have admitted evidence that Patterson was afraid of him because of his gang membership, arguing this evidence was both prejudicial and cumulative to other evidence establishing she feared him because he had been personally violent with her.

The key eyewitness in this case was Patterson, whose statements and testimony varied considerably over time. In 1999 she named the gunman as Jeffrey Donald, but years later she told police Donald was a fictitious person. At Anthony's first trial in 2008, Patterson testified she saw Anthony pull out a gun and shoot Turner, and then flee in Patterson's Dodge Neon. At Anthony's second trial in 2011, Patterson backed off that story, testifying she saw Anthony with a gun in his hand but that she did not see him shoot Turner or leave in the Neon. Patterson denied the Neon had oil on it when it was returned to her. When testifying in 2008, Patterson never said Jeffrey Donald was a real person. In 2011 she testified he was a real person who had been present on Estrella Avenue on the day of the shooting.

Patterson testified at the 2011 trial that she was not afraid of Anthony and she denied knowing what a "snitch" was. The prosecutor impeached her with prior testimony indicating she had initially lied about Anthony's identity because she feared him and she didn't want to be considered a snitch. Patterson had testified she was afraid of Anthony because he was a gang member, and that in her neighborhood snitches got killed. The trial court instructed the jury this evidence of Anthony's gang membership was being admitted "for a limited purpose only, as it goes to the thought process of . . . this witness as far as willingness to testify. That is its only value to you. [¶] This is not a gang case. . . . You are not being asked to decide gang issues in this case. But this just goes to the thought process of this witness, for that limited purpose."

20

"[E]vidence that a witness is afraid to testify is relevant to the credibility of that witness and therefore admissible." (*People v. Warren* (1988) 45 Cal.3d 471, 481.) " 'Testimony a witness is fearful of retaliation . . . is . . . admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible. [Citation.]' [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368.) Anthony's gang membership was relevant to explain why Patterson initially failed to identify him to the police, as well as her continuing contradictory testimony about what exactly she had witnessed on the day of the shooting. The trial court did not abuse its discretion by admitting this evidence.

4. *There was sufficient evidence to sustain aggravated mayhem conviction.*

Anthony contends there was insufficient evidence to sustain his conviction for aggravated mayhem (§ 205) and, therefore, the conviction must be reduced to the offense of simple mayhem (§ 203). There is no merit to this claim.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which

21

must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

> b. *The crime of mayhem.*

Simple mayhem is defined by section 203, which provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." Aggravated mayhem is defined by section 205, which provides: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole."

Anthony asserts his aggravated mayhem conviction must be reversed because there was insufficient evidence he acted with the required specific intent. He argues that "[b]ecause there was no testimony describing the actual shooting, a jury would be required to speculate that [he] harbored the required specific intent to disfigure or main. The evidence established only a sudden, random and unexpected burst of violence . . . [which] fails to establish that [he] acted with the specific intent to disfigure or maim."

Anthony is relying on the rule that specific intent to maim cannot be inferred solely from evidence the victim suffered a maiming injury, i.e., permanent disability or disfigurement. "[E]vidence of a 'controlled and directed' attack or an attack of 'focused or limited scope' may provide substantial evidence of such specific intent. [Citation.] However, where the evidence shows no more than an 'indiscriminate' or 'random' attack, or an 'explosion of violence' upon the victim, it is insufficient to prove a specific intent

22

to maim.  [Citation.]"  (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.)  "A jury may not find specific intent 'solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately.'  [Citation.]  'A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors.'  [Citation.] '[E]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim.  [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831.)

The evidence showed Anthony fired once at Turner's head, completely missing his intended target and shattering her television set.  At that point, he walked over to where Turner was lying face-down on the floor and fired two shots into her upper back.  Thus, the evidence showed Anthony's attack was both planned and precisely focused on Turner's back.  This provided sufficient circumstantial evidence of his specific intent to maim her because it is obvious such an assault could result in permanent disfigurement or disability.  For example, in *People v. Ferrell* (1990) 218 Cal.App.3d 828, the court found substantial evidence of specific intent to commit mayhem where the defendant shot the victim in the neck from two feet away, reasoning "[i]t takes no special expertise to know that a shot in the neck from close range, if not fatal, is highly likely to disable permanently."  (*Id.* at p. 835; see also *People v. Manibusan* (2013) 58 Cal.4th 40, 88 [that gunman shot victim "from very close range – only five to 10 feet – hitting her once in the face . . . and once in the upper arm, near her face. . . . reasonably supports the inference that [the gunman] . . . focused his attack on [victim's] head," thus proving "intent to cause permanent disability or disfigurement"]; *People v. Santana* (2013) 56 Cal.4th 999, 1012 ["defendant stood at close range and fired three shots with a .38-caliber revolver into the leg and buttock area of Vallejo, who lay unresisting on the ground . . . [which] strongly supports a finding that defendant intended to inflict a disabling injury"].)

23

There was sufficient evidence to sustain Anthony's conviction for aggravated mayhem.

5. *Duplicative enhancement must be vacated.*

Anthony contends, and the Attorney General properly concedes, that the trial court erred by imposing both a prior prison term enhancement (§ 667.5, subd. (b)) and a prior serious felony conviction enhancement (§ 667, subd. (a)) based on the same prior conviction. (See *People v. Jones* (1993) 5 Cal.4th 1142, 1153 [trial court cannot impose both prior prison term enhancement and prior serious felony conviction enhancement based on same underlying prior conviction]; accord *People v. Perez* (2011) 195 Cal.App.4th 801, 805 [trial court should have stricken the section 667.5 enhancement term].)

We will vacate the one-year enhancement term imposed under section 667.5, subdivision (b).

## DISPOSITION

The one-year prison term imposed under section 667.5 is vacated. As so modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.

We concur:



KITCHING, J.



ALDRICH, J.

25